## S97A2023. SOUTHERN CRESCENT NEWSPAPERS, L.P. v. DORSEY et al.

(497. SE2d 360)

SEARS, Justice.

The former legal organ of DeKalb County appeals the trial court's denial of its request for injunctive and mandamus relief after the official designation of a new county legal organ, claiming that the legislature's amendment of the statutory criteria required for legal organs should be applied retroactively to disqualify the newly-designated paper. We conclude that (1) the newly-designated paper satisfied the necessary criteria for legal organs at the time of its appointment, and (2) under our present statutory scheme, the official act of designating a new county legal organ was completed before the legislature amended the criteria for legal organs, and thus the amended criteria was not applicable. Therefore, we affirm.

The facts of this case are somewhat unusual. From 1972 until 1997, Southern Crescent Newspapers, d/b/a the Decatur-DeKalb News/Era ("the News/Era") served as the legal organ of DeKalb County. On December 27, 1996, The Champion Newspaper ("the Champion"), which has been published since 1991, formally expressed an interest in being designated to replace the News/Era as the county's legal organ. At that time, the Code required that, in order to be designated as a legal organ, at least 85 percent of a newspaper's circulation had to be comprised of paid circulations, and it must have been continuously published for at least two years.[1] Evidence introduced in the trial court showed that, as of January 15, 1997, the Champion satisfied those criteria. Seven days later, the Champion officially applied for designation as the legal organ of DeKalb County.

Under the Code, a county's designated legal organ may only be changed upon the concurrent action of a majority of the county probate judge, sheriff, and clerk of superior court.[2] On January 29, 1997, a hearing was held before the DeKalb County Probate Judge, Sheriff, and Superior Court Clerk to hear the News/Era's and the Champion's presentations regarding their respective qualifications to serve as the county's legal organ. At that hearing, it was requested that the Champion provide an independent circulation audit to show that it satisfied the Code's 85 percent paid circulation requirement, and the Champion complied with that request shortly thereafter.

On April 4, 1997, the County Sheriff and Superior Court Clerk issued a declaration "designating the Champion as legal organ of DeKalb County effective April 4, 1997 at 5:00 P.M." (The County Pro-

---

[1] OCGA § 9-13-142 (1993).

[2] OCGA § 9-13-142 (c) (1993 and Supp. 1997).

bate Judge previously had stated that he would dissent from that designation.) All interested parties were notified immediately of the Champion's designation. The designating officials specified that the publication of official notices in the Champion would commence on May 1, 1997 (later changed to July 1, 1997).

A mere ten days after the Champion's designation, on April 14, 1997, the statute governing legal organs was amended to require that, in order to serve as a county legal organ, a newspaper must have maintained an 85 percent paid circulation for at least one year. On that same day, the News/Era filed the underlying action, claiming that because the Champion had an 85 percent paid circulation only for approximately four months before being designated, the amended law should be applied retroactively to disqualify it from publishing legal notices, and the officials should be compelled to designate the News/Era as DeKalb County's legal organ. After an evidentiary hearing, the trial court denied the News/Era's request for injunctive and mandamus relief, and upheld the Champion's designation as legal organ. From that ruling, the News/Era brings this appeal.

1. On April 4, 1997, the date on which the Champion was declared to be the legal organ of DeKalb County, the Code dictated that:

> No journal or newspaper shall be declared or made the official organ of any county for the publication of . . . 'official or legal advertising' unless the newspaper shall have been continuously published and delivered to . . . paid bona fide subscribers in that county for a period of two years . . . and unless 85 percent of [its] circulation . . . is paid circulation.[3]

On appeal, the News/Era argues that the trial court clearly erred in finding that the Champion had an 85 percent paid subscription at the time of its designation. Therefore, argues the News/Era, the Champion was ineligible under the statute, as it existed at the time of designation, to serve as DeKalb County's legal organ. We disagree.

The trial court's finding that the Champion satisfied the Code's 85 percent paid subscription requirement was based upon two convincing pieces of evidence. The first of these was a circulation verification report prepared by an independent professional auditing service that specializes in analyzing circulation figures for community-based publications. The authenticity of the verification report was stipulated to by both parties. That report showed that, at the time of its designation, 89.9 percent of the Champion's distribution was

---

[3] OCGA § 9-13-142 (a) (1993).

through paid subscriptions. The second piece of evidence relied upon by the trial court was an audit prepared by the United States Postal Service to determine the Champion's eligibility for second-class mail rates. It, too, showed that more than 85 percent of the Champion's distribution was through paid subscriptions.

This Court is bound by the trial court's factual findings unless, based upon the evidence of record, those findings are clearly erroneous.[4] Based upon the evidence of record discussed above, it is clear that the trial court's finding that paid subscriptions constituted at least 85 percent of the Champion's total circulation figures was not clearly erroneous, and we reject the News/Era's contrary assertion.[5]

2. Both before and after its amendment, OCGA § 9-13-142 (c) provides that:

> . No change shall be made in the official organ of any county except upon the concurrent action of the judge of the probate court, the sheriff, and the clerk of the superior court of the county or a majority of the officers.

As discussed above, on April 4, 1997, the DeKalb County Sheriff and Superior Court Clerk acted concurrently to designate the Champion as legal organ. Ten days later, the legislature amended section 9-13-142 (a)'s eligibility criteria for legal organs to require that, in order to serve as a legal organ, a newspaper must have maintained an 85 percent paid circulation for at least one year. While that amendment was enacted after the Champion's designation, it also was enacted before the Champion was to commence publishing official legal notices. At the time of its designation, the Champion had maintained an 85 percent paid circulation for slightly less than four months. The News/Era argues that the amended eligibility criteria for legal organs should be applied retroactively to the Champion's designation, rendering it ineligible to serve as DeKalb County's legal organ, and nullifying its designation as improper. We disagree.

---

[4] *Cannon v. Coweta County*, 260 Ga. 56, 58 (389 SE2d 329) (1990).

[5] The News/Era also argues that a large percentage of the Champion's paid circulation actually consists of bulk copies delivered to advertisers and then distributed free of charge on an individual basis. While there was some evidence to suggest that the Champion does distribute part of its circulation in bulk deliveries, that evidence, standing alone, does not negate the factual bases for the trial court's finding — the two independent professional circulation audits discussed above. Furthermore, this Court previously has indicated that there are various methods of determining what constitutes "paid circulation" within the context of OCGA § 9-13-142, and that the Code does not mandate one method over another. See *Southeastern Newspapers Corp. v. Griffin*, 245 Ga. 748, 749 (267 SE2d 21) (1980). Moreover, the third party professional audit of the Champion's circulation figures was performed by a Certified Public Accountant using generally accepted accounting methods, lending further credence to its conclusions. See id.

The News/Era bases its argument on this Court's decision in *Dollar v. Wind*.[6] But a careful reading of that opinion belies the News/Era's reliance. In *Dollar*, as in this case, the legislature amended the eligibility criteria for legal organs after the Grady County sheriff declared that his office's official notices would be published in a different newspaper, but before the newly-designated paper began publishing legal notices.[7] This Court ruled that the amended eligibility criteria could be applied retroactively to disqualify the newly-designated newspaper.

Unlike this case, though, in *Dollar* the statutory process for designating a new legal organ was incomplete when the legislature amended the eligibility criteria. The 1895 Code, in effect at the time of *Dollar*, contained only one provision regarding the official action required to designate a change in legal organs: "No . . . officer shall change the advertising connected with his office from one paper to another without first giving notice of his intention to do so in the paper in which his advertisements may have been published."[8] Thus, under the 1895 Code, the Grady County Sheriff's declaration of a change in the county's legal organ carried no legal significance whatsoever. Because the only action required by the 1895 Code to effectuate a change in legal organs — publication notice of the change — had not yet been completed, the *Dollar* Court treated the sheriff's designation of the new paper as "a mere private declaration of an intention to make a change [in legal organs] in the future."[9] Since there had been no official change made in Grady County's legal organ, the *Dollar* Court applied the amended statutory criteria to disqualify the newly-designated paper.[10]

However, our current Code differs greatly from that in effect at the time of *Dollar*. Unlike the 1895 Code, our current section 9-13-142 plainly states that a change in a county's legal organ *"shall be made . . .* upon the concurrent action of the judge of the probate court, the sheriff, and the clerk of the superior court, or a majority of the officers."[11] Under our Code, so long as a designated newspaper satisfies the statutory eligibility requirements in existence at the time of designation,[12] the designation of a new paper made by a majority of the responsible county officials "shall" result in a change

---

[6] 135 Ga. 760 (70 SE 335) (1911).

[7] Under the then-existing law, only the sheriff was authorized to designate the paper in which his office's official notices would be published.

[8] Civil Code (1895) § 5460.

[9] 135 Ga. at 763.

[10] Id.

[11] (Emphasis supplied.) OCGA § 9-13-142 (c).

[12] See *Atlanta Journal & Constitution v. Clarke*, 269 Ga. 33 (497 SE2d 358) (1998); *New Era Pub. Co. v. Guess*, 231 Ga. 250, 254 (201 SE2d 142) (1973).

of legal organs.[13] Hence, unlike the situation in *Dollar*, the official declaration that a new paper shall serve as legal organ *is* the official action that effectuates a change in legal organs. Once that action is taken by a majority of the responsible officials, a change in legal organs has been implemented.

Accordingly, when the legislature amended the eligibility requirements ten days after the Champion was designated as DeKalb County's legal organ, the county's legal organ had already been changed. Put another way, the official action required by the Code to effectuate a change in legal organs was completed before the legislature added the new criterion for legal organs. Hence, the reasoning of *Dollar* simply does not apply, and the Champion was not required to satisfy the new criterion before it could become DeKalb County's legal organ. As this Court has recently reiterated, " 'The only qualifications imposed by OCGA § 9-13-142 are those which must be met *at the time of [a newspaper's] designation* as legal organ.' "[14] The Champion met the requirements that existed at the time of its designation as legal organ, and it need not have satisfied additional requirements imposed thereafter, although those additional requirements will be considered in all designations made after the amendment became effective.

This reasoning is entirely consistent with the language of the amendment to section 9-13-142 imposing additional criteria on papers that would serve as legal organs. That amendment states that it would only become effective upon being signed into law by the Governor, which occurred on April 14, 1997. Hence, the amendment applies to all designated changes in legal organs made after that date. The Champion's designation, of course, occurred ten days before the Governor signed the amendment into law, and therefore the amendment, by its own terms, does not apply to that designation.

3. Similar to the 1895 Code, our current section 9-13-142 (both before and after its amendment) also requires that "No officer shall change the advertising connected with his [or her] office from one paper to another without first giving notice of his intention to do so in the paper in which his advertisements have previously been published."

In light of the mandatory language (enacted since the time of *Dollar*) of § 9-13-142 (c) that a change "shall" be made upon the concurrent action of a majority of the responsible county officials, we agree with the trial court that the statute's notice provision is a ministerial function intended to inform the public of an impending

---

[13] See OCGA § 9-13-142 (c).

[14] *Williams v. Athens Newspapers*, 241 Ga. 274, 277 (244 SE2d 822) (1978); see *Clarke*, supra. See also *Guess*, supra.

change in legal organs, and not a prerequisite to the validity of any official designation. This conclusion is in accordance with this Court's previous ruling that the purpose of official legal advertisement is to provide adequate notice both to the parties involved in a dispute, and to the general public.[15]

This conclusion is bolstered when we consider the statute's language that *"no officer"* shall change the advertising of his or her office without first publishing notice of that change. Of course, many county officials are required to publicly advertise the actions of their offices. For example, in addition to the sheriff, probate court clerk, and superior court clerk, the county coroner and the county state court clerk are authorized under statute to publish legal notices associated with their offices.[16] Were we to conclude that publication notice of a change in the paper publishing legal advertisements is the benchmark for when a designated change in legal organs is effective, the official designation of a new county legal organ would be incomplete until at least five different county officials published individual notice of a change in their publication medium. In that situation, the failure of any one of those offices to make such a publication would prove fatal to the official designation of a new legal organ. We do not believe that the legislature intended to create such a contingent situation under OCGA § 9-13-142,[17] and we agree with the trial court that the statutory requirement that notice of a change in legal organs be published is a ministerial duty.

Obviously, the impact of this opinion is quite limited. It applies only to legal organs that were officially designated before OCGA § 9-13-142 was amended on April 14, 1997. All legal organs designated after that date, of course, must satisfy the amended statutory criteria.

4. In conclusion, we find that the trial court correctly found that the Champion satisfied the statutory criteria required of legal organs at the time it was appointed the organ for DeKalb County. We also find that because the statutory designation process already was complete when the legislature amended the criteria required of legal organs, the amended criteria is inapplicable to the Champion's designation. For those reasons, the judgment of the trial court is affirmed.

*Judgment affirmed. All the Justices concur, except Hunstein, Carley and Hines, JJ., who dissent.*

FLETCHER, Presiding Justice, concurring.

I agree that the official act for changing a county's legal organ

---

[15] *Georgia Cracker v. Hesters*, 193 Ga. 706, 708 (20 SE2d 7) (1942).

[16] See OCGA § 9-13-140, Uniform State Court Rule 8.3.

[17] See OCGA § 1-3-1 (a).

occurs when a majority of the designating officials issues the declaration naming the new official organ and that publishing notice of the change in the previous legal organ is a ministerial act. To satisfy the statutory notice requirements, any of the three designating officials may arrange for publishing the notice of the change of the legal organ. No additional notice is required from other county officers who must publish advertising in connection with their office.

CARLEY, Justice, dissenting.

In my opinion, *Dollar v. Wind*, 135 Ga. 760 (70 SE 335) (1911) is controlling authority and mandates a reversal of the trial court's order in this case. Therefore, I respectfully dissent to the majority's affirmance of what I consider to be the erroneous failure of the trial court to issue the writ of mandamus in favor of Southern Crescent Newspapers (News/Era).

In *Dollar* this Court clearly held that when an act of the General Assembly imposing an additional condition for designation as an official organ comes into effect *before* the designating officials have made an actual change in the official organ and complied with the applicable notification requirements, the designating officials thereafter are precluded from selecting a new official organ which does not satisfy the additional condition imposed by the statute. Thus, where the General Assembly passed an act requiring that the official organ have a two-year publication history and that act was

> passed before there was an actual change in the medium of publication, and before notice of intention to change was published, the Grady County Progress could not thereafter be selected as the newspaper in which the official advertisements should be published, it having been established only a few weeks.

*Dollar v. Wind*, supra at 763 (1). Unless *Dollar* is distinguishable, this Court must conclude that where, as here, the General Assembly passes an act providing that the official organ must be a publication which has maintained an 85 percent paid circulation for at least a one-year period, the designating officials can select an official organ which does not meet this additional condition only if the act became effective after the actual change in official organs was made and the applicable notification requirement was satisfied.

The majority's principal reason for concluding that *Dollar* does not control is that "our current Code differs greatly from that in effect at the time of *Dollar*." According to the majority,

> [u]nlike the 1895 Code, our current section 9-13-142 plainly states that a change in a county's legal organ *"shall be made*

> . . . upon the concurrent action of the judge of the probate court, the sheriff, and the clerk of the superior court, or a majority of the officers." . . . Hence, unlike the situation in *Dollar*, the official declaration that a new paper shall serve as legal organ *is* the official action that effectuates a change in legal organs. Once that action is taken by a majority of the responsible officials, a change in legal organs has been implemented.

(Emphasis in original.) I believe that, in its attempt to distinguish *Dollar*, the majority incorrectly relies upon its own selective quotation from the provisions of OCGA § 9-13-142 (c). The entirety of the relevant text of OCGA § 9-13-142 (c) demonstrates that, contrary to the majority's suggestion, the statute does *not* affirmatively provide that the mere selection by the designating officials, in and of itself, constitutes *the* designation of a new official organ. To the contrary, OCGA § 9-13-142 (c) plainly states, in relevant part, that "[*n*]*o change shall be made* in the official organ of any county *except* upon the concurrent action" of the designating officials. (Emphasis supplied.) Thus, it is clear that the *only* substantive change effectuated by this language is that, unlike in *Dollar*, the designation of a new official organ must now be made by the designating officials acting *collectively*, rather than individually. Therefore, in its interpretation of OCGA § 9-13-142 (c), the majority is correct only insofar as it construes this addition to the statutory framework as "mandatory language." However, it is negative mandatory language which precludes the designating officials from exercising individual authority, and not affirmative mandatory language which invests the designating officials' collective selection with any automatic legal effect.

Certainly, on April 4, 1997, nothing in the language of OCGA § 9-13-142 (c) eliminated the requirement that the designating officials, whether acting individually as in *Dollar* or collectively as in this case, must also give notification of their intent to select a new official organ. Indeed, as the majority concedes, OCGA § 9-13-142 (c) contains the *same* notification requirement that was in effect when *Dollar* was decided. Both the Code section in effect on April 4, 1997, and § 5640 of the Civil Code of 1895 provided that no officer

> shall change the advertising connected with his office from one paper to another without first giving notice of his intention to do so in the paper in which his advertisements have previously been published.

In *Dollar*, supra at 762-763 (1), we unambiguously held that,

> [w]hether this provision be treated as mandatory or direc-

tory, it imposed a duty on the officer in connection with making any change in the advertising medium of the county, and he violated his duty if he made a change without compliance with it.

As further support for its attempt to distinguish *Dollar*, the majority asserts that our continued adherence to this interpretation of OCGA § 9-13-142 (c) will result in an unacceptable "contingent situation." However, there is nothing unworkable in a simple requirement that the designating officials first give notice in the current official organ of their intention to publish future advertisements in another publication. Moreover, by retaining the statutory language for all of the years since the notification requirement in OCGA § 9-13-142 (c) was first construed in *Dollar*, the General Assembly has evidenced its intent that such requirement be construed no differently today than it was then. *Mitchell v. State*, 239 Ga. 3, 6 (235 SE2d 509) (1977). Thus, even accepting the majority's otherwise unwarranted premise that the construction previously given to the statute in *Dollar* creates a problematic procedure, only the General Assembly is authorized to rectify it.

My review of the record reveals undisputed evidence that, prior to the General Assembly's imposition of the new condition, the designating officials failed to perform their official statutory duty to give notice of their intention to change the official organ. In accordance with *Dollar v. Wind*, supra at 763 (1), "[i]f a change made without a compliance with this statute would be valid, it would only be so when the change had been actually made." The evidence here also is undisputed that no actual change in the official organ was ever made before the new statute came into effect on April 14, 1997. The agreement reached by the designating officials on April 4, 1997 was that the change would not take effect until May 1, 1997, which date was later extended to July 1, 1997. "[A]n agreement with a publisher that at some future time a change would be made, was not a completed change." *Dollar v. Wind*, supra at 763 (1). It is undisputed that the effective date of the new enactment preceded any compliance by the designating officials with their official duty to notify, and also preceded any actual change in the official organ. "Here the newspaper in which it is sought to publish the advertisements is not legally qualified to be selected for that purpose. . . . [M]andamus is a proper remedy. . . ." *Dollar v. Wind*, supra at 764 (2). Therefore, it is clear that the trial court erred in failing to issue the writ of mandamus. OCGA § 9-6-20.

The Champion Newspaper contends that the judgment nevertheless should be affirmed because the issue is "moot," in that the additional condition for its designation as the official organ has now

been satisfied. However, the newly enacted requirement for designation as an official organ does not relate only to the length of time the Champion Newspaper has been in publication. Compare *New Era Pub. Co. v. Guess*, 231 Ga. 250 (201 SE2d 142) (1973). The statute provides that a newly designated official organ must have maintained an 85 percent paid circulation for at least a one-year period prior to its designation. Proof that such a requirement has been satisfied obviously requires the submission of evidence, and does not consist only of a consideration of the contents of a calendar in the exercise of judicial notice. Even assuming that the evidence did show that the Champion Newspaper first attained an 85 percent paid circulation on January 15, 1997, there obviously is nothing in the record to show that it has maintained that level of paid circulation for the one-year period ending January 14, 1998. Moreover, the designating officials' failure to comply with their statutory duty is not a matter which can be summarily dismissed as "moot." Compare *New Era Pub. Co. v. Guess*, supra at 254. The designating officials' "effort to declare that the [Champion Newspaper] should be the paper in which such advertisements should be made was equally ineffectual, because in violation of the statute." *Dollar v. Wind*, supra at 763 (1).

It is my opinion that *Dollar v. Wind*, supra, cannot be distinguished and, that, as a matter of law, the News/Era is the official organ of DeKalb County and should remain so unless and until a new qualified official organ is named by the designating officials acting in compliance with, rather than in violation of, the statutory provisions which control their authority to make the designation. Although the majority states that the impact of its holding is "quite limited," the effect of today's decision is to vitiate the applicability of *Dollar* in this and in all future cases. Because the majority's failure to follow the holding in *Dollar* is inconsistent with the principle of stare decisis and renders OCGA § 9-13-142 (c) utterly meaningless, I respectfully dissent.

I am authorized to state that Justice Hunstein and Justice Hines join in this dissent.

DECIDED FEBRUARY 2, 1998.

*Hull, Towill, Norman & Barrett, David E. Hudson, Nancy S. Gentry,* for appellant.

*Swift, Currie, McGhee & Hiers, W. Ray Persons, W. Charles Adams, Walbert & Mathis, David F. Walbert, Charles A. Mathis,* for appellees.

*Dow, Lohnes & Albertson, Lawrence P. Auld, Peter C. Canfield, Sean R. Smith,* amicus curiae.